UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MUSA ZONJA,

     Plaintiff,

v.                         Case No. 8:21-cv-2128-VMC-MRM

LEVI BLAKE, individually,
COMPTON PERSAUD, individually;
and BOB GUALTIERI, in his official
capacity as Sheriff of Pinellas
County, Florida,

     Defendants.
_____/

**ORDER**

     This matter comes before the Court upon consideration of Defendants Levi Blake, Compton Persaud, and Bob Gualtieri's Motion for Summary Judgment (Doc. # 35), filed on August 18, 2022. Plaintiff Musa Zonja responded on September 22, 2022. (Doc. # 40). Defendants replied on October 6, 2022. (Doc. # 41). For the reasons that follow, the Motion is granted.

**I.**    **Background**

     On July 18, 2019, at about 2:30 A.M., Deputy Levi Blake, a deputy sheriff with the Pinellas County Sheriffs' Office, was on routine patrol in the vicinity of Diamond Dolls, an adult entertainment club. (Blake Depo. Doc. # 35-3 at 7:17-19, 13:7-16; Zonja Depo. Doc. # 35-2 at 9:20-10:3). Deputy

1

Blake knew Diamond Dolls and the motel next to it to be areas with high levels of drug trafficking and sex work. (Blake Depo. Doc. # 35-3 at 13:12-16). Deputy Blake routinely patrolled the parking lots in those areas. (Id.).

While on patrol, Deputy Blake saw a vehicle, which was being driven by Mr. Zonja, pulling out of the Diamond Dolls parking lot. (Id. at 14:12-15). Mr. Zonja had his windows down as his vehicle passed Deputy Blake's. (Id. at 17:24-18:1). According to Deputy Blake, Mr. Zonja had a dazed look on his face. (Id. at 19:15-17). Mr. Zonja disputes this. (Doc. # 40 at ¶ 4). As Mr. Zonja exited the parking lot, Deputy Blake followed him. (Blake Depo. Doc. # 35-3 at 19:15-20:2).

The parties dispute whether Mr. Zonja committed traffic infractions. According to Deputy Blake, Mr. Zonja engaged in multiple traffic infractions, including stopping beyond a stop bar, failing to maintain his lane while making a turn, and weaving within his lane. (Id. at 14:12-19; 19:15-24). Mr. Zonja denies committing any traffic infractions. (Zonja Depo. Doc. # 35-2 at 31:8).

Deputy Blake also saw that the car Mr. Zonja was driving had a dealer license plate affixed to it. (Blake Depo. Doc. # 35-3 at 22:1-6). Deputy Blake performed a records check on the vehicle's tag, which returned as "Unknown, unregistered."

2

(Id. at 54:20–55:1). On the night in question, Mr. Zonja was employed at an automobile dealership, and the car was in the dealership's inventory. (Zonja Depo. Doc. # 35-2 at 13:2–24). Mr. Zonja was driving the car because it needed to be driven 200 miles following automotive work, including a tire pressure monitor system, to prepare it for a customer. (Id. at 13:7–24). Deputy Blake, however, explained that the dealer tag indicated to him that misconduct could be occurring. (Blake Depo. Doc. # 35-3 at 55:4–11). Specifically, Deputy Blake stated that in his experience, "people who are typically trafficking drugs, or using drugs, or possessing them use dealer tags, rather than rental vehicles, because they don't leave a trace back to a specific vehicle themselves." (Id. at 21:2–25).

After the records check on the tag returned "Unknown," Deputy Blake initiated a traffic stop. (Id. at 20:16–20). Mr. Zonja pulled over in a parking lot, where Deputy Blake approached Mr. Zonja's vehicle, introduced himself, and asked Mr. Zonja for his driver's license. (Id. at 25:22–23; Zonja Depo. Doc. # 35-2 at 18:19–19:2). In response, Mr. Zonja pulled out a wad of cash — approximately $2,000 — that was folded in half and rubber-banded with his license on top of it. (Zonja Depo. Doc. # 35-2 at 19:2–13, 20:5–6). Deputy Blake

3

also asked Mr. Zonja for his registration and insurance, to which Mr. Zonja responded that the registration was "on the back of the car." (Id. at 21:7-12). There was some confusion between Deputy Blake and Mr. Zonja regarding where the registration was, but Deputy Blake was able to access it after realizing Mr. Zonja meant the registration was taped to the back of the license plate. (Id. at 21:10-18; Blake Depo. Doc. # 35-3 at 32:9-24).

Mr. Zonja then told Deputy Blake that his insurance information was on his phone. (Zonja Depo. Doc. # 35-2 at 22:10-11). Mr. Zonja's insurance was on a mobile application on his phone. (Id. at 22:10-13). However, when Mr. Zonja went to retrieve the insurance information from his cell phone, Deputy Blake saw him make a phone call instead. (Blake Depo. Doc. # 35-3 at 30:2-11). Mr. Zonja maintains he inadvertently placed the phone call. (Doc. # 40 at ¶ 21).

Deputy Blake then asked Mr. Zonja to step out of his car. (Blake Depo. Doc. # 35-3 at 30:16-18). Mr. Zonja refused. (Id. at 30:19-24). Deputy Blake subsequently told Mr. Zonja multiple times to get out of the car, and each time, Mr. Zonja refused to do so. (Id.; Doc. # 40 at ¶ 25). Mr. Zonja testified that after being asked to step out of the car, he asked "For

what, officer?" and requested Deputy Blake call his supervisor. (Zonja Depo. Doc. # 35-2 at 33:2-7).

Mr. Zonja also attempted to lock the car door. (Blake Depo. Doc. # 35-3 at 30:24-25; Doc. # 40 at ¶ 26). Deputy Blake then opened the car door, instructed Mr. Zonja to get out, and reached inside the car. (Id. at 31:4-6). Deputy Blake was attempting to pull Mr. Zonja from the car when Mr. Zonja eventually exited the car. (Id. at 31:4 -8). Mr. Zonja later relayed the events to a friend on a recorded jail phone call. (App'x Exhibit # 6). Mr. Zonja's account is: "I was trying to lock my doors. [Deputy Blake] caught on too quick. The car was still on. And boom, he dragged me out of the vehicle." (Id. at 4:24-4:36).

Deputy Blake arrested Mr. Zonja for resisting without violence in violation of Florida Statutes Section 843.02 based on Mr. Zonja's refusal to exit the car after being told to do so. (Blake Depo Doc. # 35-3 at 34:13-20). Deputy Blake and Corporal Persaud handcuffed Mr. Zonja. (Id. at 31:9-17). According to Mr. Zonja, he was "very frustrated" and "upset" at the time of his arrest. (Zonja Depo. Doc. # 35-2 at 36:9).

After escorting Mr. Zonja to the patrol vehicle, Deputy Blake told Mr. Zonja to get into and sit down in the patrol car numerous times, to which Mr. Zonja refused. (Id. at 42:3-

7). Mr. Zonja continued to shout and yell. (Id.; Doc. # 40 at ¶ 36). Corporal Persaud then went around to the passenger side of the vehicle, opened the back door, and pulled Mr. Zonja into the patrol car. (Persaud Depo. Doc. # 35-4 at 26:18-22). During this time, Mr. Zonja yelled "Are you serious?" as Deputy Blake shut the door. (Zonja Depo. Doc. # 35-2 at 43:5-12).

When Deputy Blake attempted to shut the door, the door made contact with Mr. Zonja's foot. (Id. at 43:20-44:5). While Mr. Zonja was inside the vehicle, he was lying down across the backseat, with both feet inside the vehicle. (Id. at 45:3-7). Mr. Zonja was lying on his back with both feet facing the driver's side rear door. (Id. at 44:2-45:13). When Deputy Blake began to close the door, the inside of the door hit Mr. Zonja's foot. (Id. at 45:21-46:3). Mr. Zonja's foot prevented the door from fully closing. (Id. at 46:1-3). At no point was Mr. Zonja's foot trapped between the door jam and the door; rather, Mr. Zonja was entirely inside the vehicle when the door made contact with his foot. (Id. at 44:2-45:7).

According to Deputy Blake, Mr. Zonja braced his foot against the door in an attempt to prevent it from closing. (Blake Depo. Doc. # 35-3 at 35:7-13). Mr. Zonja denies that he intentionally braced his foot against the door. (Doc. # 40

at ¶ 38). The parties dispute whether Deputy Blake intended to close the door on Mr. Zonja's foot. (Doc. # 35 at ¶ 40; Doc. # 40 at ¶ 40). As a result of the door hitting Mr. Zonja's foot, he experienced bruising and swelling. (Zonja Depo. Doc. # 35-2 at 46:4–15). Mr. Zonja's foot was not broken, nor did he require any surgeries. (Id. at 47:1–6).

During their depositions, Deputy Blake and Corporal Persaud testified that Mr. Zonja displayed signs of impairment. (Blake Depo. Doc. # 35-3 at 32:25–33:4). Specifically, according to Deputy Blake, Mr. Zonja had bloodshot, watery eyes, dilated pupils, the odor of alcohol on his breath, and slurred speech. (Id. at 33:2–4). Corporal Persaud noted that he smelled alcohol on Mr. Zonja's breath. (Persaud Depo. Doc. # 35-4 at 23:10–16). However, according to Mr. Zonja, he had not consumed any alcoholic beverages that day. (Zonja Depo. Doc. # 35-2 at 104:6–17).

Deputy Blake then transported Mr. Zonja to Central Breath Testing. (Blake Depo. Doc. # 35-3 at 35:14–18). Mr. Zonja refused to take a breath test or perform field sobriety tests. (Zonja Depo. Doc. # 35-2 at 58:8–23, 59:10–23). Deputy Blake cited Mr. Zonja for driving under the influence. (Doc. # 35-3 at 85). On the night of his arrest, Mr. Zonja stated "I wasn't wasted drunk. I had like one drink three hours

earlier." (Exhibit 6 at 3:01–3:22). Later, in his deposition, Mr. Zonja stated that all he drank that night was a can of iced tea. (Zonja Depo. Doc. # 35-2 at 104:12–17). Mr. Zonja explained that when he referenced having "a drink," he was referring to the non-alcoholic iced tea. (Id. at 104:18–25). Mr. Zonja's criminal charges were ultimately dismissed. (Blake Depo. Doc. # 35-3 at 53:5–7).

Mr. Zonja initiated this action on September 7, 2021, asserting the following claims: 42 U.S.C. § 1983 False Arrest against Deputy Levi Blake (Count I); State Law False Arrest/False Imprisonment against Deputy Blake (Count II); Vicarious Liability for State Law False Arrest/False Imprisonment against Sheriff Bob Gualtieri (Count III); 42 U.S.C. § 1983 Excessive Force against Deputy Blake (Count IV); State Law Battery against Deputy Blake (Count V); Vicarious Liability for State Law Battery against Sheriff Gualtieri (Count VI); 42 U.S.C. § 1983 Excessive Force against Corporal Compton Persaud (Count VII); State Law Battery against Corporal Persaud (Count VIII); Vicarious Liability for State Law Battery against Sheriff Gualtieri (Count IX); Vicarious Liability for Personal Injury against Sheriff Gualtieri (Count X); 42 U.S.C. § 1983 Unlawful Seizure against Deputy Blake (Count XI); and 42 U.S.C. § 1983 Unlawful Seizure

against Deputy Blake (Count XII). (Doc. # 1). On August 18, 2022, Defendants moved for summary judgment on all claims. (Doc. # 35). The Motion has been fully briefed (Doc. ## 40, 41), and is ripe for review.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at

trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

    A.    **Count XI – § 1983 Unlawful Seizure against Deputy Blake (Traffic Stop)**

Mr. Zonja argues that Deputy Blake violated his Fourth Amendment rights when Deputy Blake initiated the traffic stop. (Doc. # 1 at ¶ 92). The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. Const. amend. IV. A traffic stop is a constitutional detention if the officer conducting it has reasonable suspicion or probable cause to believe a traffic violation has occurred. United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." Terry v. Ohio, 392 U.S. 1, 27 (1968). Rather, the officer conducting the stop must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 120 (2000).

Courts examine "the totality of the circumstances" to determine whether the police had "a particularized and objective basis for suspecting legal wrongdoing." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). However, "[a] traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment." <u>Chanthasouxat</u>, 342 F.3d at 1276. Further, an officer's "subjective reason for [a seizure] need not be the criminal offense to which the known facts provide probable cause." <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004).

As an initial matter, if Mr. Zonja had been driving while impaired and committing traffic violations, as Deputy Blake contends, Deputy Blake would have reasonable suspicion to initiate the traffic stop. <u>See</u> (Blake Depo. Doc. # 35-3 at 18:14-23, 20:8-15) (discussing the circumstances that animated the traffic stop). However, because there is a factual dispute regarding whether Mr. Zonja was impaired and whether he had committed the traffic violations in question, the Court will focus on the license plate violation as a basis for Deputy Blake's reasonable suspicion. <u>See</u> (Zonja Depo. Doc. # 35-2 at 31:8, 104:6-17) (denying committing traffic violations or being impaired).

Mr. Zonja argues that because there was no underlying
license plate violation or improper driving, Deputy Blake did
not have reasonable suspicion to initiate the traffic stop.
(Doc. # 40 at 11). Deputy Blake asserts he initiated the
traffic stop because a reasonable officer could have believed
that Mr. Zonja was not operating the vehicle with dealer tags
in connection with a motor vehicle's business and thus was
violating Florida law. (Doc. # 35 at 12-13). Under Florida
Statute Section 320.13:

> Any licensed motor vehicle dealer and any
> licensed mobile home dealer may . . . secure
> one or more dealer license plates, which are
> valid for use on motor vehicles or mobile
> homes owned by the dealer to whom such plates
> are issued while the motor vehicles are in
> inventory and for sale, or while being
> operated in connection with such dealer's
> business[.]

Fla. Stat. § 320.13(1)(a). According to Deputy Blake, a
reasonable officer would believe, under the circumstances,
that when Mr. Zonja was operating the vehicle in a high crime
area, leaving the parking lot of a strip club, at 2:40 A.M.,
he was not doing so in connection with a dealer's business.
(Doc. # 35 at 13).

As an initial matter, Mr. Zonja's use of the dealer tag
did not violate Section 320.13(a)(1). Under the statute, an
automobile dealer may secure a dealer license plate to a

13

vehicle while that vehicle is in inventory and for sale. Fla. Stat. § 320.13(1)(a). According to an August 1, 2013, memorandum to law enforcement agencies on Section 310.13(1)(a) from the Florida Highway Safety and Motor Vehicles, "[the statute] simply means that dealers may operate vehicles on the highways of Florida *at any time* as long as the vehicle is in inventory and for sale or while being operated in connection with such dealer's business." (Doc. # 40-2) (emphasis added). Mr. Zonja explained he was driving the vehicle with the dealer tags because it needed to be driven 200 miles following automotive work, including a tire pressure monitor system, to prepare it for a customer. (Zonja Depo. Doc. # 35-2 at 13:7-24). Because Mr. Zonja was operating the vehicle with the dealer tag while it was in inventory and for sale, regardless of the time of night, his use of the vehicle was consistent with Section 320.13(1)(a). Therefore, the question before the Court is whether Deputy Blake's traffic stop was based on a "reasonable assessment of facts." <u>Chanthasouxat</u>, 342 F.3d at 1276.

Here, the totality of the circumstances surrounding the traffic stop of Mr. Zonja supports a finding of reasonable suspicion. Regardless of whether Mr. Zonja actually violated the statute, there were sufficient facts on which a reasonable

officer could reasonably suspect a violation. Deputy Blake witnessed Mr. Zonja driving a vehicle with a dealer tag in a high-crime area at approximately 2:40 A.M.. (Blake Depo. Doc. # 35-3 at 13:12–16). When Deputy Blake performed a records check on the dealer tag, it returned as "Unknown, unregistered." (Id. at 54:20–55:1). The display of a dealer tag on a vehicle being driven in a high-crime area early in the morning could suggest to a reasonable officer that the vehicle was not being used in connection with the dealership's business. See Thomas v. State, 312 So. 3d 156, 158 (Fla. 3d DCA 2021) (finding a deputy had reasonable suspicion to conduct a traffic stop based on the fact the vehicle had a dealer tag not assigned to the vehicle when the vehicle was at a gas station around midnight); Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (noting that "the fact the stop occurred in a high crime area" is among the "relevant contextual considerations in a Terry analysis" (internal quotations omitted)).

True, the DHSMV guidance clarifies that Section 320.13(1)(a) does not limit the lawful display of dealer tags to a certain time. (Doc. # 40-2). But the memorandum does not insulate vehicles displaying dealer tags from traffic stops. Rather, the memorandum provides that there is no time

15

restriction on when dealers may operate vehicles with dealer tags "*as long as* the vehicle is in inventory and for sale or while being operated in connection with such dealers' business." (Id.) (emphasis added). Indeed, taken together, the geographic area – both that it was high crime and near strip clubs – and the records check on the vehicle's tag could lead a reasonable officer to believe that the vehicle was neither in inventory and for sale nor being operated in connection with the dealer's business. See United States v. Garrette, 745 F. App'x 124, 125–26 (11th Cir. 2018) (noting an officer's belief that the driver of a vehicle was improperly using a transporter plate was reasonable where the stop occurred in a high-crime area, the vehicle was registered to a detailing business not located in the area where the stop occurred, and where the officer had never seen a transporter license used in the area).

The Court thus finds that Deputy Blake had reasonable suspicion to conduct the traffic stop. Because the traffic stop did not violate Mr. Zonja's Fourth Amendment rights, summary judgment is proper as to Count XI.

Summary judgment is granted on Count XI.

**B.     Count XII – § 1983 Unlawful Seizure against Deputy Blake (Removal from Vehicle)**

Next, Mr. Zonja contends that Deputy Blake violated his Fourth Amendment rights when Deputy Blake ordered Mr. Zonja to exit the vehicle. (Doc. # 1 at ¶ 101). "[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating [the Fourth Amendment.]" Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977). However, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). For example, a seizure may become unlawful if its duration is longer than that reasonably required to complete the "mission" that motivated the seizure. Id. But an officer may "prolong [a] detention to investigate the driver's license and the vehicle registration," including by requesting a computer check. United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001).

Here, Deputy Blake was constitutionally permitted to order Mr. Zonja to step out of the vehicle. Mimms, 434 U.S. at 111 n.6. Mr. Zonja contends that the stop was not lawful

because he did not commit the underlying license plate violation Deputy Blake pulled him over for, and thus "any order after the traffic stop would not have been lawful." (Doc. # 40 at 11). However, as the Court determined above, the initial traffic stop was lawful. Therefore, Deputy Blake was permitted to order Mr. Zonja to exit his vehicle. Mimms, 434 U.S. at 111 n.6.

Further, the duration of the seizure was not unreasonable in light of its purpose. Deputy Blake approached Mr. Zonja's vehicle at 2:46 A.M. (COBAN Dashcam Video, App'x Exhibit # 1 at 1:47). Deputy Blake testified that he asked Mr. Zonja to step out of the vehicle because it appeared Mr. Zonja was not retrieving his insurance information from his phone, as requested. (Blake Depo. Doc. # 35-3 at 30:1–18). According to Deputy Blake, after he asked Mr. Zonja to show him his insurance information, Mr. Zonja placed a phone call instead. (Id. at 30:3–11). After Mr. Zonja refused to voluntarily exit the vehicle, Deputy Blake pulled him out at 2:48 A.M. (Zonja Depo. Doc. # 35-2 at 42:3–7; App'x Exhibit # 3 at 3:14). Deputy Blake and Corporal Persaud handcuffed Mr. Zonja almost immediately thereafter. (Id. at 3:28). Deputy Blake did not undertake additional actions unrelated to the purpose of the traffic stop. Rather, Deputy Blake's

conduct — asking Mr. Zonja for his insurance information and then asking him to step out of the vehicle — was directly related to the "mission" before him. See Rodriguez v. United States, 575 U.S. 348 (2015) (citing Caballes, 543 U.S. at 408) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop . . . . Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (internal quotations omitted)). Thus, given the limited duration of time between when Deputy Blake pulled Mr. Zonja over and when he arrested him, the manner of the seizure's execution did not infringe Mr. Zonja's Fourth Amendment rights.

Summary judgment is granted on Count XII.

**C.    Count I — § 1983 Unlawful Seizure against Deputy Blake (False Arrest)**

Mr. Zonja asserts that Deputy Blake violated his Fourth Amendment rights by arresting him without probable cause. (Doc. # 1 at ¶ 31). The Fourth Amendment protects individuals from false arrest. Rushing v. Parker, 599 F.3d 1263, 1265 (11th Cir. 2010). An individual has an actionable claim under § 1983 where a law enforcement officer arrests him without

probable cause. Id. "However, '[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'" Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003) (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)).

Deputy Blake asserts that he had probable cause to arrest Mr. Zonja for violating Florida Statutes Section 843.02. The statute provides, in pertinent part: "Whoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree[.]" Fla. Stat. § 843.02. According to Deputy Blake, Mr. Zonja's refusal to step out of the vehicle after being asked constituted a violation of Section 843.02.

Here, Deputy Blake was engaged in the lawful execution of a legal duty when he ordered Mr. Zonja to exit the vehicle. As discussed, the Court finds that Deputy Blake was authorized to order Mr. Zonja to step out of the vehicle. The question before the Court is therefore whether Mr. Zonja, "by his words, conduct, or a combination thereof . . . obstruct[ed]

or resist[ed] . . . that lawful duty." C.E.L. v. State, 24 So. 3d 1181, 1186 (Fla. 2009). The Court finds that he did.

Deputy Blake directed Mr. Zonja to exit the vehicle multiple times, but Mr. Zonja refused. (Blake Depo. Doc. # 35-3 at 30:19-24; Doc. # 40 at ¶ 25). While Mr. Zonja remained in the vehicle, he attempted to lock the doors, reflecting his efforts to defy Deputy Blake's command. (Blake Depo. Doc. # 35-3 at 30:24-25; Doc. # 40 at ¶ 26). Based on Mr. Zonja's refusal to comply with Deputy Blake's orders, Deputy Blake had probable cause to arrest him. See Rodi v. Rambosk, No. 2:13-cv-556-JES-CM, 2014 WL 1876218, at *5 (M.D. Fla. May 9, 2014) (finding probable cause for an arrest under Section 843.02 where, upon being asked to step out of the vehicle after a traffic stop, Plaintiff asked why he needed to step out and explained he was reluctant to do so because of a broken foot before eventually exiting the vehicle); Zivojinovich v. Barner, 525 F.3d 1059, 1071-72 (11th Cir. 2008) (finding probable cause where the Plaintiff stood up after being told to sit by deputies even though the Plaintiff's actions "were not as egregious" as in other instances of arrest under Section 843.02). Because Deputy Blake had probable cause to arrest Mr. Zonja for violation of Section 843.02, summary judgment is proper.

Summary judgment is granted on Count I.

**D.   Count II — State Law False Arrest against Deputy
Blake**

Mr. Zonja argues that his arrest was in violation of
state law. (Doc. # 1 at ¶ 37). Under Florida law, false arrest
is "the unlawful restraint of a person against that person's
will." Willingham v. City of Orlando, 929 So.2d 43, 48 (Fla.
5th DCA 2006). "Probable cause is an affirmative defense to
a false arrest claim." Miami-Dade Cnty. v. Asad, 78 So. 3d
660, 670 (Fla. 3d DCA 2012); see Rankin, 133 F.3d at 1435
("[P]robable cause constitutes an absolute bar to both state
and § 1983 claims alleging false arrest[.]"). And "the
standard for determining whether probable cause exists is the
same under Florida and federal law." Rankin, 133 F.3d at 1435.

Because the Court has determined probable cause exists
for the purposes of Mr. Zonja's Fourth Amendment unlawful
seizure claim, the existence of probable cause defeats his
state law false arrest claim. For the same reasons explained
as to Count I, summary judgment is proper as to Count II.

Summary judgment is granted on Count II.

**E.   Count IV — § 1983 Excessive Force against Deputy
Blake**

"The Fourth Amendment's freedom from unreasonable
searches and seizures encompasses the plain right to be free

22

from the use of excessive force in the course of an arrest."
Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002). An
officer's use of force must be objectively reasonable under
the circumstances, and "must be judged from the perspective
of a reasonable officer on the scene, rather than with the
20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386,
396 (1989). To determine whether an officer used excessive
force, the Court must balance "the nature and quality of the
intrusion on the individual's Fourth Amendment interests
against the importance of the governmental interests alleged
to justify the intrusion." Tennessee v. Garner, 471 U.S. 1,
8 (1985) (internal quotations omitted). "Fourth Amendment
jurisprudence has long recognized that the right to make an
arrest or investigatory stop necessarily carries with it the
right to use some degree of physical coercion or threat
thereof to effect it." Graham, 490 U.S. at 396 (internal
citations omitted). Accordingly, courts evaluate "the facts
and circumstances of each particular case, including the
severity of the crime at issue, whether the suspect poses an
immediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight." Id.

Mr. Zonja asserts that Deputy Blake used unreasonable force when he shut the door of the police cruiser on Mr. Zonja's foot. Deputy Blake asserts that Mr. Zonja was argumentative and yelling, and so under those "tense and volatile circumstances," pulling Mr. Zonja into the cruiser and closing the door was reasonable. (Doc. # 35 at 20). Deputy Blake additionally maintains that closing the door on Mr. Zonja's foot was unintentional.

As an initial matter, Deputy Blake argues that no excessive force occurred because there is no evidence that he intentionally hit Mr. Zonja's foot with the door. In the Motion, Deputy Blake cites <u>Brower v. County of Inyo</u>, 489 U.S. 593, 597 (1989), for the proposition that only the intentional application of force gives rise to a cognizable Fourth Amendment claim. (Doc. # 40 at 20 n.11). Although Eleventh Circuit and Supreme Court precedent does not define the contours of <u>Brower</u> as applied to the facts before the Court here, the Court does not need to decide the issue today. <u>See</u> <u>Graham</u>, 490 U.S. at 399 ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry."); <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1329 (11th Cir. 2003) (finding <u>Brower</u> did not bar recovery where

24

an officer intentionally fired his gun but did not intend to hit the plaintiff because the plaintiff "was hit by a bullet that was meant to stop him"); Scott v. Harris, 550 U.S. 372, 384 n.10 (2007) ("The only question in Brower was whether a police roadblock constituted a seizure under the Fourth Amendment."). Even assuming without deciding Deputy Blake intentionally made contact with Mr. Zonja's foot, Mr. Zonja has not established that doing so constituted excessive force.

After being handcuffed, Mr. Zonja refused commands from Deputy Blake to step into the vehicle. (Zonja Depo. Doc. # 35-2 at 41:25-42:10; Blake Depo. Doc. # 35-3 at 57:8-14). Corporal Persaud ultimately ended up pulling Mr. Zonja into the vehicle. (Blake Depo. Doc. # 35-3 at 57:17-20). At that time, Mr. Zonja was yelling "are you serious?" at the two officers and was uncooperative with their commands. (Id. at 57:5-7; App'x Exhibit # 3 at 00:54-58). True, the investigation of the underlying crime — the alleged misuse of a dealer tag — did not require the use of force. See Graham, 490 U.S. at 396 (explaining that the "severity of the crime at issue" is a relevant inquiry to determine whether an officer used excessive force). And it is unlikely that at the time Deputy Blake shut the door that Mr. Zonja — who was lying

on his back across the backseat of the car — posed "an immediate threat to the safety of the officers or others[.]" Id. However, given Mr. Zonja's resistance, closing the car door was reasonable under the circumstances. From when Deputy Blake initially asked Mr. Zonja to step out of the vehicle, Mr. Zonja was yelling, disruptive, and generally uncompliant. (App'x Exhibit # 3 at 00:10–00:45). Even as the officers were asking Mr. Zonja to step into the police vehicle, Mr. Zonja continued to yell and resist. (Id.).

It was not unreasonable for Deputy Blake to attempt to contain Mr. Zonja in the back of the vehicle, especially because at the time Deputy Blake shut the door, Mr. Zonja's foot was not outside the car. (Zonja Depo. Doc. # 35-2 at 45:3–7). Indeed, the shutting of the car door itself was not a gratuitous action. Rather, it was done in order to effect Mr. Zonja's arrest. Although the door ended up hitting Mr. Zonja's foot, such force was not excessive under the circumstances, where the injury to Mr. Zonja was the incidental consequence of conduct aimed at ensuring his compliance.

Summary judgment is granted on Count IV.

**F.   Count V — State Law Battery against Deputy Blake**

Mr. Zonja argues that Deputy Blake committed a battery when Deputy Blake hit Mr. Zonja's foot with the vehicle door. (Doc. # 1 at ¶ 57). Under Florida law, "[a] battery claim [against a law enforcement officer] for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." Id. Courts assess state-law battery claims regarding excessive force under a "similar standard" to that governing Fourth Amendment excessive force claims. Sullivan v. City of Pembroke Pines, 161 F. App'x 906, 911 (11th Cir. 2006).

Here, as discussed with respect to Count IV, Deputy Blake's use of force was reasonable under the circumstances. See Cutino v. Untch, 79 F. Supp. 3d 1305, 1315 (S.D. Fla. 2015) ("[T]o the extent [Plaintiff] alleges that the Officers assaulted him during the same encounter, that claim is likewise foreclosed since any threat of force was reasonable."). At the time Deputy Blake shut the vehicle door, Mr. Zonja was resisting the officers' commands to get into the vehicle. (Zonja Depo. Doc. # 35-2 at 41:25–42:10; Blake

27

Depo. Doc. # 35-3 at 57:8-14). Indeed, Mr. Zonja's resistance was significant enough that Corporal Persaud ultimately had to pull Mr. Zonja into the vehicle. (Blake Depo. Doc. # 35-3 at 57:17-20). Given the need to contain an uncompliant arrestee in the police vehicle, Deputy Blake's closing of the vehicle door was reasonable. For the same reasons as for Count IV, summary judgment is proper as to Count V. Furthermore, because the Court has found that no liability exists as to Deputy Blake, summary judgment is also appropriate as to the claim of vicarious liability against Sheriff Gualtieri (Count VI).

Summary judgment is granted on Counts V and VI.

### G.   Count VII – § 1983 Excessive Force against Corporal Persaud

With respect to Corporal Persaud, Mr. Zonja asserts that he used excessive force where he grabbed Mr. Zonja's shoulders and twisted and torqued them to force him into the patrol vehicle while assisting Deputy Blake during the arrest. (Doc. # 40 at 16). Again, an officer may use "some degree of physical coercion" while making an arrest without running afoul of the Fourth Amendment's prohibition on excessive force. Graham, 490 U.S. at 396 (internal citations omitted). Under Eleventh Circuit precedent, "the application of de

minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1257 (11th Cir. 2000).

Here, Corporal Persaud's use of force was not unreasonable under the circumstances. True, at the time Corporal Persaud pulled Mr. Zonja into the vehicle, Mr. Zonja was handcuffed. <u>See</u> <u>Gomez v. United States</u>, 601 F. App'x 841, 850 (11th Cir. 2015) (noting the Eleventh Circuit has held "a variety of physical force techniques used by police on unhandcuffed individuals" to not constitute excessive force). However, Mr. Zonja had repeatedly refused commands to step into the vehicle. (Zonja Depo. Doc. # 35-2 at 41:25–42:10; Blake Depo. Doc. # 35-3 at 57:8–14). A reasonable officer in Corporal Persaud's position would apply a degree of physical force to ensure Mr. Zonja complied with the officers' directives, and the physical force applied was no more than that necessary to contain Mr. Zonja within the vehicle. In short, the force used was proportionate to the task at hand. <u>See</u> <u>Secondo v. Campbell</u>, 327 F. App'x 126, 131–33 (11th Cir. 2009) (finding no constitutional violation where an officer pushed a handcuffed individual into the police vehicle); <u>Buckley v. Haddock</u>, 292 F. App'x 791, 794–95 (11th Cir. 2008) (holding that the deployment of a Taser three times did not

violate the plaintiff's Fourth Amendment rights where the plaintiff, after being handcuffed, dropped to the ground, refused to stand or enter the patrol car, and was warned that if he did not comply with the officer, he would be tased).

Summary judgment is granted on Count VII.

**H.  Count VIII – State Law Battery Against Corporal Persaud**

Likewise, in Count VIII, Mr. Zonja argues that Corporal Persaud committed a battery when he grabbed Mr. Zonja's shoulder and "twist[ed] or torque[d] them while putting him in the patrol vehicle[.]" (Doc. # 1 at ¶ 77). As discussed with respect to Count VII, Corporal Persaud's use of force was reasonable under the circumstances. Corporal Persaud's use of force occurred in the process of pulling Mr. Zonja into the police vehicle. (Doc. # 1 at ¶ 77). This occurred after Mr. Zonja had repeatedly refused commands to step into the vehicle. (Zonja Depo. Doc. # 35-2 at 42:3–7).

Under the circumstances, it was not unreasonable for Corporal Persaud to apply a modicum of force in pulling an uncompliant arrestee into a police vehicle. See Cutino, 79 F. Supp. 3d at 1314–15 (finding "rough physical force" did not constitute battery where the force was "reasonably necessary given [Plaintiff's] defiant conduct"). For the same reasons

30

as for Count VII, summary judgment is proper as to Count VIII. Furthermore, because the Court has found that no liability exists as to Corporal Persaud, summary judgment is also appropriate as to the claim of vicarious liability against Sheriff Gualtieri (Count IX).

Summary judgment is granted on Counts VIII and IX.

I.   **Count X – State Law Personal Injury against Sheriff Gualtieri**

Mr. Zonja seeks to hold Sheriff Gualtieri vicariously liable for Deputy Blake's alleged negligence. (Doc. # 1 at ¶ 88). Mr. Zonja argues that Deputy Blake acted negligently when he shut the vehicle door on Mr. Zonja's foot, and because Deputy Blake was acting within the scope of his employment, Sheriff Gualtieri is vicariously liable. (Id. at ¶ 87; Doc. # 40 at 18).

Sheriff Gualtieri argues that summary judgment should be granted on Count X because the "negligent" use of excessive force is not a cognizable cause of action. (Doc. # 35 at 24). According to Sheriff Gualtieri, because Mr. Zonja alleged that Deputy Blake's actions constituted excessive force, Mr. Zonja cannot simultaneously allege negligence. (Id.).

The Court agrees with Sheriff Gualtieri. Under Florida law, "there is no such thing as the 'negligent' commission of

an 'intentional' tort." <u>Sanders</u>, 672 So. 2d at 48. While "a separate negligence claim based upon a distinct act of negligence may be brought against a police officer in conjunction with a claim for excessive use of force . . . the negligence component must pertain to something other than the actual application of force during the course of the arrest. It cannot serve as the exclusive basis for liability in an excessive force claim." <u>Id.</u> (citation omitted). Put differently, the conduct underlying an excessive force claim must be "separate and distinct" from that giving rise to a negligence claim. <u>See</u> <u>Secondo</u>, 327 F. App'x at 131 (finding a state law negligence claim must fail where the allegedly negligent conduct is not "separate and distinct" from that forming the basis of an excessive force claim).

Here, the factual allegations in the complaint supporting Mr. Zonja's negligence claim are not separate and distinct from his claim of excessive force. Mr. Zonja's negligence claim incorporates the factual allegations common to all counts and states that Sheriff Gualtieri is vicariously liable for Deputy Blake's "negligence." (Doc. # 1 at ¶ 88). The factual allegation concerning Deputy Blake's conduct states that, "Deputy Blake shut the door on Mr. Zonja's ankle and foot." (<u>Id.</u> at ¶ 21). The conduct giving rise to the

negligence claim — Deputy Blake's hitting Mr. Zonja's foot with the vehicle door — is thus indistinguishable from that underlying the excessive force claim. (Id. at ¶ 53, 89). Therefore, there is no distinct conduct that separates the allegedly negligent conduct from the excessive force claim.

Regardless, even if negligence was a cognizable cause of action here, Mr. Zonja has not presented evidence sufficient to survive summary judgment. The Court has already determined that closing the vehicle door to contain Mr. Zonja, an uncompliant arrestee, was reasonable under the circumstances. Mr. Zonja's foot was inside of the vehicle while Deputy Blake attempted to close the door. (Zonja Depo. Doc. # 35-2 at 45:3-7). Mr. Zonja has not presented evidence that Deputy Blake knew that Mr. Zonja's foot was in the way of the door closing, nor has he argued that Deputy Blake should have known. Accordingly, under the circumstances here, Mr. Zonja has not sufficiently demonstrated that Deputy Blake was negligent when he shut the vehicle door.

Summary judgment is granted on Count X.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants   Levi   Blake,   Compton   Persaud,   and   Bob
      Gualtieri's Motion for Summary Judgment (Doc. # 35) is
      **GRANTED**.

(2)   Summary   judgment   is   granted   in   favor   of   Levi   Blake,
      Compton Persaud, and Bob Gualtieri on all counts of the
      complaint.

(3)   The Clerk is directed to enter judgment accordingly and,
      thereafter, **CLOSE** the case.

      **DONE** and **ORDERED** in Chambers in Tampa, Florida, this 9th
day of January, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE